# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 12, 2014

Docket No. 34,126

IN THE MATTER OF
GRACE H., a child,

STATE OF NEW MEXICO, ex. rel.,
CHILDREN, YOUTH AND FAMILIES
DEPARTMENT,

      Petitioner-Respondent,

v.

MAURICE H.,

      Respondent-Petitioner.

ORIGINAL PROCEEDING ON CERTIORARI
John Julio Romero, District Judge

Law Offices of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

for Petitioner

New Mexico Children, Youth & Families Department
Rebecca J. Liggett
Santa Fe, NM
for Respondent

## OPINION

**VIGIL, Chief Justice.**

**{1}** This case concerns a father whose parental rights were terminated pursuant to NMSA 1978, Section 32A-4-28 (2005), which provides the mechanism for terminating parental rights under the Abuse and Neglect Act, NMSA 1978, Section 32A-4-1 to -34 (1993, as

amended through 2009). In the proceedings below, the district court concluded that his parental rights should be terminated pursuant to a finding of abandonment under Section 32A-4-28(B)(1), without establishing that the conditions of neglect, by abandonment, could be not be cured, as required by Section 32A-4-28(B)(2). The father appeals that ruling, asserting that an ambiguity in Section 32A-4-28 led to an incorrect ruling. He avers that the Children Youth and Families Department (the Department) used its unfettered discretion to pursue a theory of abandonment under Section 32A-4-28(B)(1) without establishing that it made reasonable efforts to cure the causes of neglect, as required by Section 32A-4-28(B)(2).

**{2}** While we do not necessarily agree with the father's framing of the issue on appeal, we do agree that Section 32A-4-28 is ambiguous with respect to when abandonment may be used as a basis for termination of parental rights. We also agree that this ambiguity led to the improper termination of his parental rights in this case. For the reasons that follow, we reverse the district court's ruling.

## I. FACTUAL BACKGROUND

**{3}** Grace H. (Child) was born on September 25, 2006, to Tessa P. (Mother) and Anthony Maurice H. (Father), as a result of an extramarital affair. Father was married and had other children with his wife, while Mother was unmarried and had one other child, Brother. Some time after Child was conceived in Albuquerque, New Mexico, Father moved his family to Texas and Mother followed. Once Child was born, Father saw Child a few times a week for the first three months of her life. In January 2007, Mother left Texas with Child and moved to her parents' home in Albuquerque. After their departure, Father made some efforts to stay in contact with Mother and Child through phone calls and emails, but he did not visit Child. These communications took place throughout 2007, and Father only communicated once with Mother in 2008. Thereafter, Father was not in contact with Mother or Child from 2008 to February 2011.

**{4}** In June 2008, Mother moved into her boyfriend's house in Albuquerque. In December 2008, the Department took Child and Brother into custody because the Department received a referral concerning physical abuse of Child and Brother. The children were temporarily placed with their maternal grandmother in Albuquerque, but she was unsure of maintaining the voluntary placement for financial reasons.

**{5}** The Department began searching for Father in 2009, but it used an incorrect name. Although Mother told the Department she was willing to help find Father, the Department did not solicit her help.

**{6}** Father returned to Albuquerque in September 2009. By that time, the Department failed to locate Father or notify him that termination of his parental rights was in process. In April 2010, Father heard from a friend that Child and Brother were in the Department's custody. Father promptly contacted the Department and identified himself as Child's father.

2

Father made an appointment to meet with the Department a few days later, on April 19, 2010. Father brought his wife and children to the meeting; a department official described the children as well dressed and well behaved. Father told the Department he had tried to find and contact Mother and Child, but was unsuccessful. Father told the Department that he wanted custody of Child and asked for visits with her in the meantime. Father admitted that he had not filed the paperwork seeking custody of the Child or paid child support.

{7}     The next day, a department supervisor told Father over the phone that the Department did not plan to reunite him with Child or allow visitation and planned to go forward with adoption and the termination of his parental rights. The department supervisor advised Father to hire an attorney. Following Father's meeting, the Department held an internal meeting to discuss the situation. The Department acknowledged that it could have chosen to evaluate Father further and consider him as a placement option, but instead chose to just move forward with the termination hearing. The Department indicated that it was late in the case and the Child needed permanency.

## II.     PROCEDURAL BACKGROUND: PHASES OF THE ABUSE AND NEGLECT PROCEEDINGS

{8}     The following is an outline and analysis of the procedural history that ultimately resulted in the termination of Father's rights. It illustrates just how the ambiguity in Section 32A-4-28 came to be exposed in this case. Further, it informs our ultimate holding that Father's rights were improperly terminated by a finding of abandonment under Section 32A-4-28(B)(1).

### A.     Initial Custody, Adjudication, and Assessment

{9}     The first phase of an abuse and neglect proceeding involves a determination of the basis for the removal of the child from the parents' custody and an adjudication of abuse or neglect. *See* §§ 32A-4-14 to -20. Upon the adjudication of abuse or neglect, the district court orders the family to undergo assessments in order to develop a treatment plan to address the causes and conditions that led to the child's removal from the home. Section 32A-4-21.

{10}     In these beginning phases, Father was never given notice of the proceedings, as required by Section 32A-4-18(B), so he did not appear at the initial hearings. The Department did not locate Father to notify him that the Department had taken custody of Child. The Department had mistakenly identified Father as Maurice H., but his name is actually Anthony Maurice H. This misidentification likely led to the Department's failure to effectuate service upon Father. With the exception of the Department's failure to serve Father by searching for him under his proper name, there do not appear to be any unusual circumstances surrounding the initial custody, adjudication, and assessment phase.

### B.     Treatment Phase

3

**{11}** The second phase is treatment. Once assessments are completed and recommendations are made for treatment, the Department presents the family treatment plan to the district court, which the district court considers and, if appropriate, adopts. *See* § 32A-4-21(B)(10). The family treatment plan is adopted at the dispositional hearing, which takes place thirty days after the adjudication of abuse and neglect. *See* § 32A-4-22(A). The treatment plan identifies the required counseling, drug testing, and supervised visitation arrangements that the parents must complete in order to address the causes and conditions which led to removal of the child from the home. The Department is ordered to assist the parents in following through with treatment. Section 32A-4-22(C). During the treatment phase, the Department monitors the parents' progress in treatment and reports to the district court at review hearings.

**{12}** On May 27, 2009, the district court adopted a family treatment plan for Father. The treatment plan required Father to complete a psychosocial assessment, a substance abuse assessment, sign releases of information, provide names of relatives to the Department, follow all recommendations, and take a paternity test. The family treatment plan had an estimated completion date of August 1, 2009, which was subsequently extended to November 1, 2009, and then to May 1, 2010.

**C.    Permanency Phase**

**{13}** The third phase is permanency, which begins within six months of the initial judicial review of the child's dispositional order adopting the family treatment plan, or within twelve months of a child entering foster care, whichever occurs first. *See* § 32A-4-25.1(A). Section 32A-4-25.1(B) provides:

> B. At the permanency hearing, all parties should have the opportunity to present evidence and to cross-examine witnesses. At the conclusion of the permanency hearing, the court shall order one of the following permanency plans for the child:
>
> > (1) reunification;
> >
> > (2) placement for adoption after the parents' rights have been relinquished or terminated or after a motion has been filed to terminate parental rights;
> >
> > (3) placement with a person who will be the child's permanent guardian;
> >
> > (4) placement in the legal custody of the department with the child placed in the home of a fit and willing relative; or
> >
> > (5) placement in the legal custody of the department under a planned

4

permanent living arrangement, provided that there is substantial evidence that none of the above plans is appropriate for the child.

**{14}** The permanency phase is a critical point in the case because the district court must decide whether the permanent placement of the child must be changed from reunification to adoption. *See* § 32A-4-25.1(B). This determination depends upon the parents' progress in treatment. The district court considers whether the parents have made sufficient progress in eliminating the causes and conditions which led to the removal of the child from their care.

**{15}** Once the permanency plan is changed from reunification to adoption, the Department is obligated to focus its efforts on securing and supporting a permanent home for the child rather than on assisting the parents with treatment. "If the parents fail to rebut [the presumption that adoption or other permanent placement is in the child's best interest] by a preponderance of the evidence, the district court must enter an order changing the plan to adoption and relieving [the Department] of any further efforts to reunite the child and parent." *State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004-NMCA-083, ¶ 20, 136 N.M. 53, 94 P.3d 796. At this stage, the district court makes a specific determination of whether the Department is relieved from making further efforts to assist the parent with treatment. However, the parent is still entitled to participate in treatment and make progress towards alleviating the causes which led to the removal of the child from their care.

**{16}** In this case, the district court maintained Father's treatment plan and did not relieve the Department from further efforts to assist Father with treatment. The initial permanency hearing took place in this case on November 17, 2009. The order from that hearing was not entered until March 5, 2010. At the first permanency hearing, the Department requested to change its plan in order to terminate Mother's parental rights instead of trying to reunite her with the children. The district court ultimately changed the permanency plan to adoption. Father still had not been located and served, and he did not appear at the permanency hearing. The second permanency hearing was held on February 1, 2010. The order from the second hearing was entered on February 15, 2010, before the order from the first permanency hearing.

**{17}** The Department failed in a critical way at this point in the proceedings because the district court kept in place the family treatment plan for Father. The family treatment plan dated January 19, 2010, was part of the permanency hearing report that was incorporated into the permanency order of February 15, 2010. The permanency hearing report contained the family treatment plan for Father previously adopted by the district court, and stated that the reasons for lack of progress toward the desired outcomes were that "Mr. [H.] has not complied with his court ordered treatment. H[is] whereabouts [are] unknown to the Department at this time."

**{18}** In April 2010, when Father met with the Department, it failed to inform Father that the district court had maintained the family treatment plan for him in its permanency order entered February 15, 2010, which contained an estimated date of completion of May 1, 2010.

5

Despite being under court order to implement Father's treatment plan, the Department did not provide Father with information regarding his treatment plan, which would have at the very least informed him that the plan existed and allowed him to pursue the required assessments and testing, even if it was on his own.

**{19}** After Father's initial meeting, the Department held an internal meeting to discuss the situation. Despite the existing permanency order incorporating the family treatment plan for Father, the Department asserted *that it could have chosen* to evaluate Father and consider him as a placement option, but instead chose to just move forward with the termination hearing. The Department indicated that it was late in the case and Child needed permanency. Accordingly, the department supervisor told Father that the Department did not plan to try to reunite him with Child or to allow him visitation, and planned to go forward with the termination of parental rights hearing scheduled in three weeks. Such disregard for the permanency order requiring the Department to implement Father's treatment plan eventually led the district court to make decisions about Father based on something other than the facts.

**{20}** In addition to these failures, the Department refused to take additional steps to locate Father, despite the fact that during the permanency phase, Mother told the Department she was willing to help find Father, it did not solicit her help.Rather, the Department continued to relay the same misinformation it had from the inception of the case concerning Father's identity, that "Mr. [H.] is named as the biological father of [Child]. H[is] whereabouts [are] unknown to the Department at [t]his time. The Department has conducted an absent search and putative father inquiry." Further, Father should have been informed that he was entitled to the appointment of an attorney. *See* NMSA 1978, Section 32A-4-10(B) (2005); *see also State of N.M. ex rel. CYFD v. Amanda M.*, 2006-NMCA-133, ¶ 20, 140 N.M. 578, 144 P.3d 137 (holding that "parents in an adjudication of abuse and neglect have a statutory right to effective assistance of counsel," which "exists from the inception of an abuse or neglect proceeding.") (internal quotation marks and citation omitted). Instead, the department supervisor simply advised Father to hire an attorney. It was not until June 15, 2010, that the district court appointed Father an attorney.

### D.    Termination of Parental Rights Phase

**{21}** The fourth phase of the case is the termination of parental rights. *See* §§ 32A-4-28 to -29. The Department filed its motion for termination of parental rights on March 18, 2010, and requested a hearing sixty days from the date the motion was filed.

**{22}** The Department sought the termination of Father's parental rights under Sections 32A-4-28 and 29. The Department did not identify if it sought to terminate Father's parental rights under Section 32A-4-28(B)(1) for abandonment or Section 32A-4-28(B)(2) for neglect and abuse that is unlikely to change. On April 22, 2010, Father answered the allegations in the motion for termination of parental rights.Father denied the Department's allegation that he had made no effort to contact the Child and that the Department had made reasonable efforts to locate him. Father alleged that the Department failed to assist with his reunification

6

efforts. Further, he denied the Department's allegation that the termination of his parental rights would be in Child's best interest.

**{23}** Even though the Department had actually met with Father in person in April 2010, it filed an amended motion for termination of parental rights on May 4, 2010, which stated:

> The Department has continued to attempt to locate Mr. [H.], but has been unable to do so. Mr. [H.] has had no contact with the Department or the child during this case, well over six months. Mr. [H.] has not provided any support to the child during the life of this case. Mr. [H.] has never acted as a father to the child during this case. Mr. [H.] has never asked for visitation with the child during the life of this case.

It further stated that "[a]s a result of the above stated facts, [the] parental rights of M[aurice] H., with respect to the child should be terminated pursuant to NMSA, 1978 Comp., [S]ections 32A-4-28 and 29, as amended." The Department made these allegations under oath. By doing so, the Department misrepresented to the district court what it knew about Father and his willingness to parent Child. In our view, the Department ignored its legal responsibility to implement Father's family treatment plan and further proceeded to subvert Father's efforts to take responsibility for Child. Such misconduct led the district court to decide the merits of this case based on half-truths rather than on Father's actual ability to care for Child.

**{24}** The first termination hearing was set for May 18, 2010. A summons of Father was filed on April 26, 2010, and the return of service was filed on May 18, 2010. The termination hearing took four months to complete due to continuances. It was completed on September 29, 2010. The district court entered findings of fact and conclusions of law on November 8, 2010, in which it concluded that it was in Child's best interests to terminate Father's parental rights. A post-termination permanency hearing was held on November 24, 2010, and a permanency order was entered on December 6, 2010.

**{25}** Around the time of the first scheduled termination hearing, on May 18, 2010, Child and Brother were still in foster care with their maternal grandmother, and the Department maintained that it was still investigating the potential placement with an aunt in Utah, although it appears Child had no relationship with her. Despite the Department's insistence that it was still pursuing placement with the aunt, the record reflects that Child was living with foster parents who did not wish to adopt her as of March 18, 2010. Child was not placed with a potentially adoptive, non-relative family until July 2010. As late as the September 29, 2010, termination hearing, the Department acknowledged that Father and his wife could potentially adopt both children if it would conduct a home study of them, but it declined to do so. The Department pursued this position despite the fact that under Section 32A-4-29(F), "[w]hen a motion to terminate parental rights is filed, the [D]epartment shall perform concurrent planning." A concurrent plan for placement with Father could have been pursued but the record does not reflect that the Department ever made such a plan.

**{26}**   Child's guardian ad litem testified at the termination hearing on September 29, 2010, stating that "it would be in [Child's] best interests to know her father." In her view, Father did everything he could to keep in touch with Child without alienating Mother. She also testified that she felt Father should not be considered an unfit parent just because he did not know that paying child support or registering on the putative father registry would help in asserting his parental rights. The guardian ad litem also testified that it seemed like the Department was "trying very hard to terminate [Father's] rights, and I submit to you that this is not in the best interests of [Child]." Further, the guardian ad litem averred that just because Child was placed in a non-relative home that would like to adopt her at the time of the hearing, she did not believe that was a reason to terminate Father's parental rights. Accordingly, the guardian ad litem asked the district court to deny the motion to terminate Father's parental rights, order visits between Father and Child, and give Father the chance to raise Child.

**{27}**   Throughout these hearings, evidence was presented that Father was married, volunteered in his church, worked as a grocery store produce manager, and had four children living at home and a fifth who was a successful adult. Father had no criminal record. Father testified that he loved Child and wanted to be there for her every day, and regretted not seeking custody more aggressively, but had not done so because he did not want to take Child away from Mother as long as Mother was caring for her.

**{28}**   The district court found that Father had been a good parent to his other five children and was fit to parent Child. It also found that Father had failed to communicate with or provide support for Child for longer than three months and did not provide justifiable cause for such failure. The district court ultimately found that it was in Child's best interests to terminate Father's parental rights, and did so pursuant to Section 32A-4-28(B)(1).

**{29}**   Father moved to reopen the termination proceedings on March 21, 2011, in order to enter additional evidence in the form of an affidavit of Mother, stating that despite Father's attempts to contact her, she had refused to disclose any information that would allow him to locate her. The district court granted Father's motion to reopen the termination proceeding on June 9, 2011. A hearing was held on June 20, 2011, to take the testimony of Mother. Amended findings of fact and conclusions of law were entered on August 31, 2011. Once again the district court concluded that Father's parental rights should be terminated pursuant to Section 32A-4-28(B)(1). A final judgment terminating Father's parental rights was entered on September 13, 2011, incorporating by reference the August 31, 2011, findings of fact and conclusions of law. Father appealed that judgment on September 16, 2011.

**{30}**   The district court found that any relationship Father had with Child had disintegrated and that Father had abandoned her. A permanency hearing was held on the same day, and both Child and Brother were adopted by their foster family. Notably, despite the fact that the adoption was not made permanent until seventeen months after the termination proceeding began in May 2010, the Department refused to consider Father as a placement.

8

**{31}** In sum, the various instances of the Department's misconduct include its failure to locate and serve Father, its failure to provide Father with the family treatment plan and allow him to participate as ordered by the district court, its misrepresentation to the district court that Father had still not contacted the Department after he had, and its misleading reports about the status of the Utah placement. The repeated miscarriage of the process deprived the district court of the opportunity to make a decision based on the entire story. Although we do not fault the district court's decisions based on the information it had, we believe that the district court should be presented an opportunity to reconsider this case with full knowledge of the facts.

## E.    Appeal

**{32}** Father appealed from the order terminating his parental rights. *State ex rel Children Youth and Families Department v. Maurice H.*, No. 31,597, mem. op. ¶ 1 (N.M. Ct. App. Mar. 25, 2013) (non-precedential). Father argued that the district court erred by terminating his parental rights without making a finding that the causes and conditions of his abandonment could not be remedied. *Id.* Father additionally argued that because he appeared in the district court's termination proceedings prior to the termination of his rights, the district court was constrained to terminate his parental rights under Section 32A-4-28(B)(2). *Maurice H.,* No. 31,597, mem. op. ¶ 2.

**{33}** The Court of Appeals affirmed, concluding that the district court properly terminated Father's parental rights under Section 32A-4-28(B)(1). *Maurice H.,* No. 31,597, mem. op. ¶ 2. The Court of Appeals agreed with the district court that it was unnecessary to make a finding that the Department had made reasonable efforts to reunite the family in order to terminate Father's parental rights under Section 32A-4-28(B)(1). *Maurice H.,* No. 31,597, mem. op. ¶ 2. We now reverse the Court of Appeals because we agree with Father that his rights should have been adjudicated under Section 32A-4-28(B)(2).

## III.    DISCUSSION

**{34}** The legal question on appeal concerns the meaning and function of Section 32A-4-28, which provides the mechanism for terminating Father's rights. In light of the numerous missteps illustrated above, our reading of the statute is that Section 32A-4-28(B)(1) is to be used in instances when a parent is completely absent prior to termination. Further, Section 32A-4-28(B)(2) is to be used where a parent is present and willing to participate some meaningful time prior to termination. As articulated below, this reading is supported by both the language and framework of the statute, as well as the policies underlying the Children's Code and the fundamental nature of parental rights.

## A.    Statutory Scheme

**{35}** This Court reviews issues of statutory interpretation de novo. *State v. Almanzar*, 2014-NMSC-001, ¶ 15, 316 P.3d 183. Traditional principles of statutory construction apply

to our interpretation of Section 32A-4-28. "Our principal goal in interpreting statutes is to give effect to the Legislature's intent." *Griego v. Oliver*, 2014-NMSC-003, ¶ 20, 316 P.3d 865. To glean the Legislature's intent, the Court "first turn[s] to the plain meaning of the words at issue." *Id.* ¶ 21 (internal quotation marks and citation omitted). This Court will only proceed with further statutory analysis "[i]f the relevant statutory language is unclear, ambiguous, or reasonably subject to multiple interpretations." *Almanzar*, 2014-NMSC-001, ¶ 15. "However, we exercise caution in applying the plain meaning rule." *State v. Smith*, 2004-NMSC-032, ¶ 9, 136 N.M. 372, 98 P.3d 1022. "Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *Id.* (internal quotation marks and citation omitted). Further, the Court rejects "a formalistic and mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute." *Id.* ¶ 10. Finally, we analyze a "statute's function within a comprehensive legislative scheme." *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939. "In other words, a statutory subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter." *Id.* (internal quotation marks and citation omitted).

{36} The termination statute at Section 32A-4-28 provides in pertinent part:

B. The court shall terminate parental rights with respect to a child when:

(1) there has been an abandonment of the child by his parents;

(2) the child has been a neglected or abused child as defined in the Abuse and Neglect Act and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the department or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child. The court may find in some cases that efforts by the department or another agency are unnecessary, when:

(a) there is a clear showing that the efforts would be futile;

or

(b) the parent has subjected the child to aggravated circumstances; or

(3) the child has been placed in the care of others, including care by other relatives, either by a court order or otherwise and the following conditions exist:

10

(a) the child has lived in the home of others for an extended period of time;

(b) the parent-child relationship has disintegrated;

(c) a psychological parent-child relationship has developed between the substitute family and the child;

(d) if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent;

(e) the substitute family desires to adopt the child; and

(f) a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been rebutted.

{37}    The plain language of the statute provides three mechanisms by which to terminate parental rights: abandonment under Subsection (B)(1), abuse and neglect under Subsection (B)(2), and presumptive abandonment under Subsection (B)(3), all of which incorporate some form of abandonment. NMSA 1978, Section 32A-4-2(A)(2)(a) defines abandonment, as referenced in Subsection (B)(1), as "instances when the parent, without justifiable cause . . . left the child with others, including the other parent or an agency, without provision for support and without communication for a period of three months if the child was under six years of age at the commencement of the three-month period." One definition of a neglected child as contemplated by Subsection (B)(2) is a child "who has been abandoned by the child's parent, guardian or custodian." Section 32A-4-2(E)(1). Finally, Section 32A-4-28(B)(3) lists the factors supporting a finding of presumptive abandonment by the parent. *See State ex rel. Children, Youth and Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 39, 146 N.M. 286, 209 P.3d 778 ("Under Section 32A-4-28(B)(3), a court may terminate parental rights based on presumptive abandonment.").

{38}    A plain reading of this statutory language indicates that the Legislature intended abandonment as grounds for termination in three instances. This raises the question: If there are three applications of abandonment as a basis for termination, then what is the difference between them, and when should they be applied?

{39}    Presumptive abandonment seems clearly distinct from the other two types of abandonment, and it is not applicable here. Child had not been placed with a substitute family with which she formed a psychological parent-child relationship and which desired to adopt her. Accordingly, two provisions remain. Father argues that the statute is ambiguous as to the difference between abandonment and neglect by abandonment, and he argues that the statutory language does not evidence any clear legislative intent as to when either

11

provision should be applied. Based on a plain language reading of the statute, we agree that there is some ambiguity.

{40}     What can be told from the language of the statute is that Subsection (B)(1), the abandonment provision under which Father's rights were terminated, does appear to create a bright-line rule. As stated in the definition of abandonment, where a parent leaves a child under six years old in the care of another for three months (as was the case here) without provision for her care, and where that parent does not communicate with the child, the parent has abandoned the child. That abandonment alone appears to be grounds for termination without further inquiry. However, this same bright-line can apply under Subsection (B)(2) where neglect refers to the very same definition of abandonment. The only difference between the two subsections is that under Subsection (B)(1), the Department is not required to make any attempt to assist a parent in reunification attempts, while Subsection (B)(2) requires the Department to make "reasonable efforts . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." The question still remains: when should either provision be applied? This case is illustrative.

{41}     The issue before this Court has been framed as a question of when the Department has the authority to move for termination of parental rights on a theory of abandonment under Subsection (B)(1) versus Subsection (B)(2). This is not an accurate framing of the issue. Based on our review of the record, and what has been discussed, it is apparent that the Department did not choose one or the other, but rather the entire process was conducted as an abuse and neglect proceeding under Subsection (B)(2). This is clear from the Department's adoption of a family treatment plan and its initial attempts to reunite the family, steps which are not included in proceedings under Subsection (B)(1). These steps contemplated Father's participation. Further, when the Department moved to terminate Father's rights, it generically stated facts supporting an abandonment finding and asked that the district court terminate pursuant to Section 32A-4-28 without specific reference to Subsection (B)(1). It was the district court that then went on to conclude that Father had abandoned under Subsection (B)(1) as grounds for termination of his parental rights. Which raises the question: If the entire case was proceeding under Subsection (B)(2), and if Subsection (B)(2) gives the district court the same authority to terminate parental rights by abandonment, then why did the district court shift from Subsection (B)(2) and terminate Father's parental rights under Subsection (B)(1)?

{42}     The district court had at least some justification for finding abandonment under Subsection (B)(1) because, under a plain language reading of the statute, there was at least one three month period during which, without justification, Father neither communicated with, nor provided for Child. However, because this case was proceeding under Subsection (B)(2), which provides the same authority to terminate by a finding of abandonment, there is no discernable reason why the district court ordered termination under Subsection (B)(1). Rather, it should have terminated by abandonment under Subsection (B)(2), because the Department and the district court had proceeded under that provision throughout the life of the case. Under this reading, it becomes clear to this Court that the Legislature intended

Subsection (B)(1) to be used when there is no parent present with whom the Department could work towards reunification prior to termination. It follows that when a parent is present and willing to participate prior to termination, as Father had indeed done in this case, then the termination of parental rights should proceed on the basis of abuse and neglect under Subsection (B)(2).

**{43}** While we may never fully understand the district court's reasons for electing to terminate under Subsection (B)(1), we ultimately conclude that it was the Department's arbitrary actions that created an incomplete picture, ultimately leading the district court to make its decision without being fully informed. Because Father sought to cooperate with the Department in order to retain his parental rights, the Department remained obligated to attempt to make reasonable efforts to assist Father in curing the condition of neglect, and the district court was constrained to terminate Father's parental rights only under Subsection (B)(2). Instead, the Department ignored its obligation, and its arbitrary actions led the district court to doubt Father's presence and willingness to care for Child. The district court based its decision to terminate under Subsection (B)(1) on a lack of information and full disclosure of the actual facts. The Department's actions ultimately exposed the ambiguity in the statute, which put this case before this Court.

**{44}** As this case illustrates, if we were to rely on the plain meaning rule, as applied to this particular statute, and affirm the district court's ruling, it is exactly the type of instance where the beguiling simplicity of its application "may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *Smith*, 2004-NMSC-032, ¶ 9. While this statute appears to give the district court the authority to have terminated Father's rights for the reasons it did, this case illustrates that there is some ambiguity in how to apply the abandonment provisions contained therein. We hold that Subsection (B)(1) is to be used to terminate parental rights by a finding of abandonment where a parent is absent prior to termination, and Subsection (B)(2) is to be used where a parent is present and expresses a legitimate desire to take responsibility for a child prior to termination. This holding is consistent with the policies underlying both the Children's Code and the fundamental nature of parental rights.

### B.     Policy Considerations

**{45}** There are two policy considerations that support this reading of the statute. These considerations bear directly on whether Subsection (B)(2) must be applied, rather than Subsection (B)(1), in a case such as this where a parent attempts to assert his rights prior to termination. The two policy considerations are the purposes expressed in the Children's Code and the fundamental nature of parental rights.

**{46}** First, the purpose of the Children's Code, expressed at NMSA 1978, Section 32A-1-3(A) (2009), is in pertinent part:

13

to provide for the care, protection and wholesome mental and physical development of children coming within the provisions of the Children's Code and then to preserve the unity of the family whenever possible. A child's health and safety shall be the paramount concern. Permanent separation of a child from the child's family, however, would especially be considered when the child or another child of the parent has suffered permanent or severe injury or repeated abuse. It is the intent of the legislature that, to the maximum extent possible, children in New Mexico shall be reared as members of a family unit.

This purpose statement is reinforced in the termination section: "[i]n proceedings to terminate parental rights, the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated." Section 32A-4-28(A).

**{47}** Second, the fundamental nature of parental rights has been established by both the United States Supreme Court and this Court. The former has stated that there is a "fundamental liberty interest of natural parents in the care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). In *Santosky*, the Supreme Court discussed its "historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Id*. The Supreme Court noted the gravity of this fundamental right, stating:

> Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Id*. at 753-754.

**{48}** This Court has also recognized the fundamental nature of parental rights. *See State ex rel. Children, Youth and Families Dep't v. Mafin M.*, 2003-NMSC-015, ¶ 18, 133 N.M. 827, 70 P.3d 1266. The Court acknowledged that the "right to raise one's child is a fundamental right protected by the Fourteenth Amendment to the United States Constitution." *Id*. "It is a right far more precious . . . than property rights." *Id*. ¶ 20 (internal quotation marks and citation omitted). This Court has also held, however, that the "right is prima facie and not an absolute right." *Roberts v. Staples*, 1968-NMSC-109, ¶ 20, 79 N.M. 298, 442 P.2d 788. Therefore, the right "must yield when the best interests and welfare of the child are at issue." *Id*.

**{49}** As established by these authorities, the rights of parents are fundamental. However,

14

while the interests of a child may conflict with these fundamental rights, both the statutes and the common law attempt wherever possible to harmonize the interests. Therefore, it seems as though a bright-line application of the abandonment provision in Subsection (B)(1) to the facts of this case is in conflict with the fluidity expressed in the Children's Code and the case law. Such a strict application not only counters that fluidity, but it seems to disregard the fundamental right of Father and does not recognize the severity of the consequences of such a simple, strict application on such a delicate right. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 118 (1996) ("The object of the proceeding is not simply to infringe upon [the parent's] interest . . . but to end it; thus, a decision against the parent work[s] a unique kind of deprivation . . . . Few forms of state action . . . are both so severe and so irreversible." (alterations in original) (internal quotation marks and citation omitted)).

**{50}** If the policies underlying the code, as well as the gravity of the fundamental rights of parents are taken into consideration, it becomes clear that a bright-line application of the abandonment provision in this case is contrary to those policies and rights. That then raises the question: Why did the Legislature use such a simple mechanism for terminating such a delicate, fundamental right? Father argues that the purpose of the abandonment provision in Subsection (B)(1) is to terminate based on abandonment where a parent is completely absent prior to termination. This interpretation comports with the entire termination statute because when a parent is completely absent, the Department cannot make any reasonable effort to assist that parent as required by Subsection (B)(2).

**{51}** This case appears to be one in which the Department avoided its obligation to help the parent alleviate the causes for removal of the child from their care when such parent is ready, willing, and able to try to do so. It did so without any justifiable basis. The record indicates that the permanency plan, including the Utah placement, was less than settled prior to termination. Father contacted the Department and attempted to assert his rights approximately one month prior to the initial termination hearing, at a time when a court ordered plan for his treatment existed. The Department articulated no reason it had to believe that Father was unfit. The guardian ad litem actually testified to the contrary—that he appeared fit—and recommended that the Department consider Father. Further, the termination proceeding lasted approximately five months, which raises the question: If the Department knew that the Utah placement was less than certain, then why not at least evaluate Father during that time prior to final judgment on termination? Aside from the statutory requirements and due process concerns, common sense would seem to indicate that the Department should have evaluated Father under these circumstances.

**{52}** Under this particular set of facts, this case seems like exactly the type of case that is unfit for an application of a rigid, bright-line abandonment standard as the basis of termination. To the contrary, it seems like precisely the type of case that would have benefitted from the more flexible and involved approach expressed in Subsection (B)(2). The best interests of Child would still have been paramount, while Father's fundamental rights would have been respected by at least exploring some reasonable effort to reunify. Such an effort would have satisfied the stated purposes of keeping the family intact whenever

15

possible. Instead, the Department shut down the entire process when Father was actually present, willing, and very likely able to take care of Child. In the words of the Court of Appeals of Kentucky, "[t]o terminate a father's parental rights on this basis under this provision flies in the face of the true spirit and intent of this statute, which is to sever relations between innocent children and a deadbeat, disinterested parent." *G.R.M. v. W.M.S.*, 618 S.W.2d 181, 184. (Ky. Ct. App. 1981).

**{53}** Based on our analysis, it is clear to this Court that Father's parental rights were improperly terminated under Subsection (B)(1), when he was entitled to assistance and treatment under Subsection (B)(2). This is clear because both subsections refer to the same definition of abandonment as grounds for terminating parental rights, but one requires such assistance, and the other does not. Considering the stated purpose of the Children's Code and the fundamental nature of parental rights, we hold that where a parent is present and willing to participate prior to termination, termination by abandonment must follow from Subsection (B)(2). Accordingly, we reverse the termination of Father's parental rights under Subsection (B)(1).

## IV.    REMEDY

**{54}** While we hold that Father's rights were improperly terminated under Subsection (B)(1), we recognize that under our construction of the termination statute, his rights could be properly terminated under (B)(2), but only after Father has been assessed and treatment provided to him in an effort to cure the condition of neglect. We also recognize that Child is now part of an adoptive family, and that creating permanency for Child as soon as possible is of the utmost importance. With these considerations in mind, we remand to the district court to reconsider the termination of Father's parental rights in light of our interpretation of Subsections (B)(1) and (2) consistent with this opinion, and instruct the district court to conduct assessments of Father and Child. These assessments at the very least should include the evaluations of Father previously ordered by the district court in its family treatment plan, as well as a bonding study of Child in her adoptive home.

**{55}** After these assessments are completed, the district court should exercise its discretion under the statute to provide a remedy that is consistent with Child's best interests. We recognize that the district court could very likely face a conundrum if it finds both that the causes of neglect by abandonment can be cured and that Child has bonded with her adoptive family. If the district court finds that remaining in her adoptive home with Brother is ultimately in Child's best interests, Father could choose to relinquish his parental rights given that Child has bonded with her adoptive family. In that case, an open adoption could be the best outcome given the challenges created by the passage of time. Of course, this particular remedy does not preclude the district court from electing any of the remedies available to it under the Abuse and Neglect Act. What is paramount is that the district court be able to make its ruling on a fully informed presentation of the facts.

## V.    CONCLUSION

**{56}** The Department's refusal to work with Father undermined his attempt to be a part of his child's life. The Department's obstinance towards Father and its position that Father's "abandonment" of Child justified termination of his parental rights effectively made it easier for a total stranger to acquire parental rights to his child than for Father to maintain his. This is inconsistent with the purposes of the Children's Code and the fundamental nature of Father's parental rights. Further, by deliberately presenting misleading or incomplete information to the district court and failing to assess Father's ability to care for Child, the Department effectively forced the district court to make its ruling on incomplete information. The district court thereby terminated Father's rights without giving him the opportunity for assessment and treatment that it had previously ordered and that he should have been afforded under Subsection (B)(2). Accordingly, we reverse the termination of Father's parental rights under Subsection (B)(1) and remand for further proceedings consistent with this opinion.

**{57}** **IT IS SO ORDERED.**

_____
**BARBARA J. VIGIL, Chief Justice**

**WE CONCUR:**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

**PETRA JIMENEZ MAES, Justice**, **dissenting**

**MAES, Justice (dissenting).**

**{58}** I believe the mere fact that a formerly absent parent without justification for his or her absence, reappears immediately prior to a termination proceeding does not impose a duty upon CYFD to make reasonable efforts to reunify the family and termination is appropriate under Subsection (B)(1). The majority holds otherwise; thus, I respectfully dissent.

**I.** **THE COURT OF APPEALS' MEMORANDUM OPINION AFFIRMING THE TERMINATION OF FATHER'S PARENTAL RIGHTS**

**{59}** After the district court terminated his parental rights, Father appealed to the Court of Appeals. *See In re Maurice H.*, No. 31, 597, mem. op. (N.M. Ct. App. Mar. 25, 2013)

17

(non-precedential). I begin with a summary of the Court of Appeals' proceedings and holding.

**{60}** Father argued that when a parent appears prior to the termination of rights proceeding and seeks custody of his or her child, "the Act should be construed to require the district court to consider termination of parental rights under the abuse and neglect provision[, Subsection] (B)(2), rather than under Subsection (B)(1)." *Id.* ¶ 6. Father asserted that this is because there is a more rigorous standard for termination of rights under Subsection (B)(2) and the Act provides no guidance for when the Legislature intended that each subsection be used. *Id.* Father insisted that Subsection (B)(1) was enacted only to allow CYFD to terminate parental rights when a parent does not appear before termination, is not seeking custody, and/or is unwilling to assume full financial responsibility for the child. *Id.* ¶ 9. This construction, Father contended, is supported by the Legislature's intent to keep the family together. *Id.*

**{61}** The Court of Appeals noted that Father did not appeal the district court's finding that he abandoned Grace but "asserts as a dispositive fact that he appeared prior to termination of his parental rights and sought custody of [Grace]." *Id.* ¶ 2. The Court determined that on appeal Father "solely raise[d] an issue of statutory construction, arguing that because he sought custody prior to termination of his parental rights . . . the district court [could] only terminate those rights pursuant to Section 32A-4-28(B)(2), which first requires CYFD to make reasonable efforts to reunite the family." *Id.* ¶ 2.

**{62}** The Court of Appeals held that when read as a whole, the clear language of the Act allows for termination of parental rights pursuant to Subsection (B)(1), without reasonable efforts to reunify, even when the parent seeks custody prior to termination. *Id.* ¶ 7. In looking at the plain text of the statute, the Court of Appeals concluded that "CYFD is statutorily required to engage in reasonable efforts to reunite the parent and child under Section 32A-4-28 only when it seeks a termination based upon a parent's abuse and neglect," pursuant to Subsection (B)(2). *Id.* ¶ 4. Therefore, CYFD is not held to a reasonable efforts standard when it chooses to pursue parental rights termination under either Subsection (B)(1) or (B)(3).

**{63}** Father appealed to this Court and we granted Father's petition for certiorari to address three questions: (1) whether the New Mexico Legislature intended to limit the application of Section 32A-4-28 (B)(1) to parents who fail to appear altogether prior to the termination of parental rights hearing, (2) whether CYFD is required to make reasonable efforts to reunite a child and a parent when a parent, who has abandoned his child for the statutory period specified in Section 32A-4-2(A), appears, seeks custody, and accepts financial responsibility for his child prior to a termination of parental rights hearing, and (3) whether the Legislature intended for CYFD to have unfettered discretion to pursue a termination of parental rights pursuant to either Section 32A-4-28(B)(1) or Subsection (B)(2).

## II.    STANDARD OF REVIEW

18

**{64}** "In proceedings seeking the termination of parental rights, the grounds for any attempted termination must be proved by clear and convincing evidence." *State ex rel. Dep't Human Servs. v. Peterson*, 1985-NMCA-102, ¶ 17, 103 N.M. 617, 711 P.2d 894. A district court's decision to terminate parental rights will be upheld "if it applied the proper rule of law." *Id*. Neither party disputes that Father's conduct constituted abandonment by clear and convincing evidence. Thus, we are left to resolve whether the district court pursued termination of rights under the wrong subsection of Section 32A-4-28(B).

**{65}** Our interpretation of a statute is a question of law that an appellate court reviews de novo. *State v. Tafoya*, 2010-NMSC-019, ¶ 9, 148 N.M. 391, 237 P.3d 693. "We begin by looking at the language of the statute itself." *State v. Smith*, 2004-NMSC-032, ¶ 9, 136 N.M. 372, 98 P.3d 1022. In addition to the plain language, "we also consider the history and background of the statute." *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939. This Court does not read into a statute "language which is not there, particularly if it makes sense as written." *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (internal quotation marks and citation omitted)."We must read different legislative enactments as harmonious instead of as contradicting one another." *State v. Muniz*, 2003-NMSC-021, ¶ 14, 134 N.M. 152, 74 P.3d 86, *superseded in part by statute*, NMSA 1978, § 32A-2-20(A), (G) (2005), *as recognized in State v. Jones*, 2010-NMSC-012, ¶ 19, 148 N.M. 1, 229 P.3d 474.

## III. DISCUSSION

**{66}** The majority overrules the Court of Appeals because it disagrees that the issue before this Court is "a question of when the Department has the authority to move for termination of parental rights on a theory of abandonment under Subsection (B)(1) versus Subsection (B)(2)." *Opinion*, ¶ 41. Instead, it identifies "the legal question on appeal [as concerning] the meaning and function of Section 32A-4-28, which provides the mechanism for terminating Father's rights." *Id*. ¶ 34. The majority finds that the district court proceeded under Subsection (B)(2) "throughout the life of the case," *id.* ¶ 42, because it ordered a treatment plan for Father at the beginning of the case; thus, the district court should have terminated by abandonment under Subsection (B)(2) and not Subsection (B)(1). *Id*. ¶ 41. However, the stipulated judgment and disposition as to mother and Justin entered on March 16, 2009, indicated that Father had not been located or served, did not appear at the hearing and still had not reappeared in Grace's life. It was the family treatment plan and predisposition study attached to the stipulated judgment and disposition as to mother and Justin that referenced Father. The family treatment plan and predisposition study indicated that Father would be assessed for treatment, sign a release of information and provide relatives names for possible placement, admit harmful effects of substance abuse and participate in a paternity test. Mother and Justin are mentioned in the summary of the treatment plan which outlined their treatment but did not mention Father. Not having an attorney and not being present, the district court did not have jurisdiction to order treatment for Father.

**{67}** The majority holds that "it becomes clear to this Court that the Legislature intended

19

Subsection (B)(1) to be used when there is no parent present with whom the Department could work towards reunification prior to termination." *Opinion*, ¶ 42. Yet seemingly contradictory, the majority also holds that "the district court had at least some justification for finding abandonment under Subsection (B)(1) because, under a plain language reading of the statute, there was at least one three-month period during which, without justification, Father neither communicated with, nor provided for [Grace]." *Id.* Thus, it is unclear which part of Court of Appeals' opinion is being reversed by the majority.

{68}    In fact, the majority opinion does not challenge any legal analysis in the Court of Appeals' opinion and appears to address only the third issue raised in Father's petition for certiorari—whether the Legislature intended for CYFD to have unfettered discretion to pursue a termination of parental rights pursuant to either Section 32A-4-28(B)(1) or Subsection (B)(2). However, the issue at hand is not whether CYFD *could* have acted more sympathetically toward Father, but whether the district court properly ordered the termination of Father's parental rights based on abandonment pursuant to Subsection (B)(1).

{69}    Section 32A-4-28(B), which outlines the process for terminating parental rights, provides that the court must terminate parental rights when (1) the child has been abandoned by his parents, (2) the child has been abused or neglected and such conditions "are unlikely to change in the foreseeable future despite reasonable efforts by the department . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child," or when (3) "a presumption of abandonment [has been] created." *See* § 32A-4-28(B)(1)-(3).

{70}    Father argues to this Court that one of the statutory factors of a "neglected child" is one who was "abandoned," and thus abandonment is a form of neglect that requires the higher standard of termination (i.e. reasonable efforts) when a parent is present. *See* Section 32A-4-2(E)(1) (defining a "neglected child" to include one who has been abandoned by the parent). Father argues that once he reappeared CYFD could have taken alternative action and pursued termination of parental rights under Subsection (B)(2) in order to allow Father to remedy the conditions that rendered him unable to parent Grace. I disagree.

{71}    From the plain language it is clear that the only time the statute mandates that CYFD make "reasonable efforts" to "assist the parent in adjusting the conditions that render[ed] the parent unable to properly care for the child" prior to termination of rights is when a child has been "neglected or abused" pursuant to Subsection (B)(2). Section 32A-4-28(B)(2). Thus, a termination pursuant to Subsection (B)(2), abuse or neglect, requires the implementation of a treatment plan, which the district court periodically monitors prior to termination. *See id.*

{72}    The statute is silent as to when it intended for courts to affirm Subsection (B)(1) termination as opposed to Subsection (B)(2). *Peterson*, the only case to speak to a court's choice between abandonment and neglect, held that the two provisions are "separate, independent grounds for terminating parental rights . . . [e]ach is alternative to the other."

20

1985-NMCA-102, ¶ 16.

**{73}** The Court of Appeals found that because Subsection (B)(1) "only requires a finding [of abandonment] and no treatment plan is mandated for parents who abandon their children . . . the Legislature generally did not intend for terminations based on abandonment to require findings about reasonable efforts." *Maurice H.*, No. 31, 597, mem. op. ¶ 8. "This construction is reasonable because the parent who abandon[s] [their] child [is] not, in most instances, present to perform the treatment plan that would lead to a reasonable efforts evaluation at the termination stage." *Id.* ¶ 10.

**{74}** I agree with the Court of Appeals and submit that this holding is not novel. *See State ex rel. Children, Youth & Families Dep't v. Amy B.*, 2003-NMCA-017, ¶ 2, 133 N.M. 136, 61 P.3d 845 (stating that cases of actual abandonment do not require a finding of reasonable efforts on behalf of CYFD to assist the parent); *see also State ex rel. Children, Youth & Families Dep't v. John D.*, 1997-NMCA-019, ¶ 6, 123 N.M. 114, 934 P.2d 308 (noting that unlike Subsection (B)(2), presumptive abandonment under Subsection (B)(3) does not require CYFD to establish reasonableness of efforts to assist the parent). Further, "[t]here is no indication that the parent who has abandoned the child must receive services or benefit from a treatment plan." *State ex rel. Children, Youth & Families Dep't v. Benjamin O.*, 2009-NMCA-039, ¶ 31, 146 N.M. 60, 206 P.3d 171.

**{75}** The Court of Appeals held that "[w]e will not read additional language into the statute to restrict the Subsection (B)(1) ground for termination by abandonment only to instances where the parent does not want custody, especially when the statute is logically sound as written." *Maurice H.*, No. 31, 597, mem. op. ¶ 11. I agree. Following Father's argument, "CYFD would always have to pursue termination under Subsection (B)(2)'s abuse and neglect requirements and would have to engage in reasonable efforts in every case in which a formally absent parent appears and seeks custody, and would never be able to terminate parental rights under Subsection (B)(1)." *Id.* ¶ 13. Such an interpretation would deem Subsection (B)(1) superfluous which is contrary to our rules of statutory interpretation. *See Baker v. Hedstrom*, 2013-NMSC-043, ¶ 24, 309 P.3d 1047 ("This Court must interpret a statute so as to avoid rendering the Legislature's language superfluous.").

**{76}** As in *Benjamin O.*, there is no indication here that Father, who abandoned Grace, must receive services or the benefit of a treatment plan. The record shows that Father had not seen Grace since three months after her birth in 2006. In December 2008, CYFD took Grace into custody because Mother was unable to care for Grace. Father was still absent at that time. On March 18, 2010, CYFD filed for a termination of Father's parental rights and requested a hearing on the matter on April 18, 2010. On April 19, 2010, Father made his first contact with CYFD, inquiring about Grace. At this time Father had been absent from Grace's life for four years. Father expressed a desire to adopt Grace and Brother but CYFD explained to Father that permanency was in Grace's best interest and it was proceeding with the termination proceeding. On May 4, 2010, CYFD filed an amended motion for termination of Father's parental rights and incorrectly informed the district court that CYFD had not had

21

any contact with Father. CYFD did not explain this error. However, such misinformation did not lead a "blindfolded [district court] down a path paved by manipulations, half-truths, and misrepresentations" as the majority suggests. *Opinion*, ¶ 31. Instead, a review of the record indicates that the district court was fully apprised of all pertinent facts from both parties.

**{77}** The district court entered an extensive findings of fact and conclusions of law on November 8, 2010, which discussed the following information. The relationship between Mother and Father began when Father was working at a homeless shelter in Albuquerque and Mother and her son were receiving services at the shelter. Concerned with Mother's ability to care for her son, Father invited Mother and her son to live with Father and his wife (Wife). Father and Mother began a sexual relationship which resulted in the birth of Grace. After a short separation, Father and Wife moved to Texas. Mother moved to Texas and continued her relationship with Father. After Grace was born, Father and Wife assisted Mother with parenting Grace. Prior to Grace turning three months old, Father and Mother ended their relationship and in December 2006 Mother returned to Albuquerque to live with her parents who Father and Wife had previously met. Thereafter, Father never tried to communicate with Mother or Grace. Father moved to Oklahoma but Wife and their children did not go with him. While there, Father had minimal contact with Wife and no contact with Mother or Grace. In early 2007, Father and Wife moved back to Albuquerque and then during the summer they moved to Oklahoma and stayed there until September 2009. While they were in Oklahoma, Father and Mother attempted to stay in contact by email. No later than 2008, Father had numerous telephone conversations with Mother and at least one conversation with Grace. Father knew that Mother and Grace were living in Albuquerque. Father acknowledged that he did not look for Grace while he lived in Oklahoma because he had to take care of and provide for Wife and their four children. Father, Wife, and their children moved back to Albuquerque in September 2009. Father never tried to get an order for custody, time sharing, or provide child support for Grace. Prior to the filing of the motion for termination of parental rights, Father's last contact with Mother was September 2009, when he lived in Oklahoma. Father knew that Mother had a history of being homeless yet never reported Grace missing nor contacted Grace's grandparents to see if they might know where Grace was. Any relationship Father may have had with Grace had disintegrated. However, Grace's guardian ad litem testified that Grace would benefit from knowing Father and asked the court not to terminate Father's rights, to order visitation, and give Father an opportunity to raise Grace. The district court found that Father had failed to communicate with or provide support for Grace for a period longer than three months, the statutory period for abandonment specified in Section 32A-4-2(A), without justification. Having considered all of the evidence, the district court found it in Grace's best interests to terminate Father's rights pursuant to Section 32A-4-28(B)(1).

**{78}** Father was afforded a second opportunity to convince the district court that his rights should not be terminated when the court granted his motion to reopen the termination proceedings and held a hearing on June 20, 2011. During this hearing, Mother testified that she had prevented contact between Grace and Father because Mother believed that Father wanted to rekindle their romantic relationship instead of reconnecting with Grace. Mother

also testified that she never told Father that Grace had been taken into CYFD custody. Even the majority acknowledges that evidence of Father's solid marriage, stable job, successful children, volunteer work, and love for Grace was presented at the termination hearing. *See Opinion*, ¶ 27.

**{79}** The district court filed an amended findings of fact and conclusions of law on August 31, 2011. The district court found that Father "stated he did little to look for his child . . . because he had to take care of and provide for [Wife] and their four children." The court further found that Father made minimal efforts to locate or visit Grace, did not utilize any community resources in his search for Grace, and never paid any child support to Mother. Once again, the district court ruled that Father's rights should be terminated pursuant to Section 32A-4-28(B)(1).

**{80}** While CYFD's statements to the district court regarding Father's communication prior to the first termination hearing were incorrect, it is clear that Father had ample opportunity to present his side, not only once, but twice. Based on the orders from the district court, it is apparent that the court considered all of the presented evidenced before ruling. I disagree with the majority that the district court was blindfolded or manipulated in any way.

**{81}** Under the facts of this case, CYFD sought to terminate Father's rights under the sole theory of abandonment as there was no evidence of neglect. The disjunctive nature of Section 32A-4-28(B) suggests that the Legislature intended to protect young children from abandonment. *See* § 32A-4-2(A)(2)(a) (defining abandonment as only a three-month period if the child is under six years old). By making "abandonment," without the procedural safeguards seen in Subsection (B)(2), an exception to the Legislature's usual concern for terminating parental rights, it is conceivable that the Legislature intended to prevent the reunification of a formerly absent parent to protect the child. Although Father may now want to parent, under the statutory scheme, Father abandoned Grace and is subject to those consequences—to hold otherwise weakens the Act's intent to protect children from abandonment. *See Benjamin O.*, 2009-NMCA-039, ¶ 31. The majority reads into Subsection (B)(1) the requirement that the parent never reappear to seek custody as a qualifying event prior to CYFD pursuing termination based solely on abandonment. This interpretation conflicts with long-standing statutory construction principles. *See e.g. High Ridge Hinkle Joint Venture*, 1998-NMSC-050, ¶ 5.

**{82}** In addition to disagreeing with the majority's new rule that Subsection (B)(1) termination is prohibited when a parent reappears and seeks custody, I also am gravely concerned with the suggested remedy in this case. Not only is the remedy unclear, it delays permanency and stability for Grace. *State ex rel. Children, Youth & Families Dep't v. Mafin M.*, 2003-NMSC-015, ¶ 24, 133 N.M. 827, 70 P.3d 1266 (explaining that "it is important for children to have permanency and stability in their lives, [so] termination proceedings should not continue indefinitely.") "It is well established that parents do not have absolute rights to their children; rather, parental rights are secondary to the best interests and welfare of the

23

children." *State ex rel. Children, Youth & Families Dep't v. John R.*, 2009-NMCA-025, ¶ 27, 145 N.M. 636, 203 P.3d 167 (alteration, internal quotation marks, and citation omitted).

**{83}** The majority holds that Father's parental rights were improperly terminated under Subsection (B)(1) and as such reverses the termination of said rights. *Opinion*, ¶ 52. The majority then remands this case to district court with "instructions to conduct assessments of Father and [Grace]," and requires that "[a] bonding study of [Grace] in her adoptive home" be completed. *Opinion*, ¶ 53. Following possible supervised visits, this opinion requires the district court to "hold an evidentiary hearing to determine the ultimate disposition of the case." *Id*. The majority suggests that should the district court find that Grace remaining with her adoptive parents is in Grace's best interest, Father could "relinquish his parental rights on the condition that there be an 'open adoption.'" *Opinion*, ¶ 54.

**{84}** By reversing the termination of Father's parental rights under Subsection (B)(1), the majority has reinstated Father's fundamental right to parent Grace. *Opinion*, ¶ 52. However, Father is not afforded assistance and treatment to attempt to cure the condition of neglect (abandonment). The remedy is a remand to district court to determine whether "remaining in her adoptive home is in [Grace's] best interests" and to hold an evidentiary hearing to determine the ultimate disposition of the case. What does disposition mean? How is the district court to determine the ultimate disposition of the case without adjudicating Father's parental rights?

**{85}** The remedy is based on the assumption that "maintaining a relationship with Father is in the [Grace's] best interests." There is nothing in the record to support that assumption. As of November 2011, Grace is doing very well with her new family. Grace wants to take the last name of her adoptive parents. An additional two years has now passed. Even by Father's own account of the facts there is no indication that Grace ever knew her Father. There is also no basis for the determination that assessments of Father and Grace, a bonding study of Grace in her adoptive home, and limited supervised visits will provide the evidence that the court needs. While the majority raises concerns with the hearings before the district court, I have every confidence in the ability of the district court judge to determine what studies and what evidence is needed to make a decision whether "remaining in her adoptive home is in [Grace's] best interests."

**{86}** Also troubling is the direction given to the district court if there is a finding that remaining in her adoptive home is in Grace's best interests. The district court is told to allow Father to relinquish his parental rights on the condition that there be an "open adoption." Not wanting to disrupt the adoption, the hope is that Father will relinquish his parental rights if there is an open adoption. Yet, as a result of this opinion, there is nothing to prohibit Father from asserting his fundamental right to parent Grace, refusing an open adoption, and filing for full custody, thus prolonging permanency for Grace. Father has maintained all along that he and Wife are capable of parenting both Grace and Brother full time. The fact that the majority suggests Father may relinquish his newly reacquired rights to parent Grace in favor

24

of an "open adoption," after Father has fought for years in the judiciary to regain said rights, is fantasy. *See Opinion*, ¶ 54. Further, the majority fails to consider the effect on Grace of Father parenting her full time and separating Grace from Brother. What happens if the Court finds that an open adoption is not in Grace's best interests? What rights do the adoptive parents have?

**{87}** Which factual scenario is likely to play out in this case is immaterial regarding the precedent set forth in this opinion. Rather, the factual problem is illustrative of the potential legal confusion that this opinion supports.

## IV.  CONCLUSION

**{88}** The Court of Appeals was correct in affirming the district court's termination of Father's parental rights pursuant to Section 32A-4-28(B)(2). Subsection (B)(2) is an independent ground for termination of rights in the statutory scheme and does not require that CYFD make reasonable efforts to reunite a child with his or her absent parent. There was no evidence of neglect and therefore CYFD's decision to terminate Father's parental rights under a sole theory of abandonment was not an abuse of discretion. The majority's holding conflicts with the Children's Code's goal of permanency and the Legislature's intent to protect children from absent parents. Thus, I would affirm the Court of Appeals and hold that the district court properly terminated Father's rights.

_____
**PETRA JIMENEZ MAES, Justice**